ORIGINAL



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

UNITED STATES OF AMERICA,
*ex rel*
THOMAS JAMES KIRBY
2806 Fairmount Road
Cleveland Heights, Ohio 44118

        Plaintiff,

v.

UNIVERSITY HOSPITALS
HEALTH SYSTEM, INC.
c/o Janet Miller, Statutory Agent
10524 Euclid Ave., Suite 1100
Cleveland, Ohio 44106

UNIVERSITY HOSPITALS
OF CLEVELAND, INC.
c/o Janet Miller, Statutory Agent
10524 Euclid Ave., Suite 1100
Cleveland, Ohio 44106

UHHS/CSAHS – CUYAHOGA, INC., dba
ST. VINCENT CHARITY HOSPITAL,
c/o CT Corporation System, Statutory Agent
1300 E. 9th Street, Suite 1010
Cleveland, Ohio 441114

THE SISTERS OF CHARITY OF
ST. AUGUSTINE HEALTH SYSTEM
c/o A.G.C. Co., Statutory Agent
1900 East Ninth Street, Suite 3200
Cleveland, Ohio 441114

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.

# 1:03CV1579

**VERIFIED COMPLAINT**
**(Jury Demand Endorsed Herein)**

JUDGE NUGENT

MAG. JUDGE VECCHIARELLI

False Claims Act.
31 U.S.C. §§ 3729, *et seq.*,
and Common Law Causes of Action



For his complaint, the Plaintiff alleges as follows:

## I. NATURE OF ACTION

1.     The Plaintiff brings this action on behalf of the United States to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33 (FCA), and to recover damages and other monetary relief under the common law or equitable theories of fraud, unjust enrichment, payment by mistake of fact, recoupment and disgorgement of illegal profits, and to recover statutory restitution for criminal offenses.

2.     These claims are based upon defendants' submission of false and fraudulent patient claims and hospital cost reports to the United States in order to obtain millions of dollars in payments for various healthcare services from 1989 through 2001. These false claims and false statements were part of defendants' unlawful scheme to obtain business by paying kickbacks and illegal remuneration to physicians, and entering into prohibited financial relationships with physicians, to induce such physicians to refer patients to defendants' facilities.

3.     Defendants University Hospitals Health System, Inc. (UHHS) and University Hospitals of Cleveland, Inc. (UHC)(collectively "UHHS") on their own behalf, or through or on behalf of their affiliates and subsidiaries used and concealed of illegal arrangements to induce physicians to refer patients to UHHS. Top management of UHHS participated in offering and paying kickbacks to physicians, and failed to discontinue the unlawful practices even after repeated warnings by their own Internal Audit personnel. Management and officers of UHHS and its various subsidiaries and affiliates, knew that paying kickbacks to and engaging in particular types of relationships with physicians was unlawful. Nevertheless, they negotiated, authorized, reviewed, approved and/or failed to rectify the payment of kickbacks, illegal remuneration and unlawful financial relationships like those described in this Complaint.

4.      Defendants, in accord with established company practice, paid kickbacks to physicians in return for patient referrals and engaged in financial relationships with physicians, in violation of the Anti-kickback Statute, 42 U.S.C. § 1320a-7b(b), the Stark Statute, 42 U.S.C. § 1395nn, and various state laws and ethical canons of the medical profession, and then submitted false and/or fraudulent claims, and false and/or fraudulent statements, to the United States to receive payments for services rendered to patients referred by those physicians.

5.      Defendants offered remuneration to physicians in various forms, including but not limited to (1) reimbursement to third-party medical practices (referred to by Defendants as "Practice Plans") for salaries and expenses far in excess of fair market value and/or actual costs incurred; (2) payments to third-party medical practices and or physicians labeled as reimbursement or "Practice Guarantee Agreements" that were supposed to be repaid, when it was understood that the amounts would not have to be repaid regardless of what the physician's receipts were and that no interest and/or repayment would be required; (4) directorship contracts that provided for payments to physicians not required to perform any duties; and (5) salary payments to physicians' employees.

6.      The physicians to whom defendants provided illegal remuneration and kickbacks and with whom defendants entered into illegal financial relationships referred large volumes of patients, including Medicare and Medicaid patients and beneficiaries of other government healthcare programs, to UHHS hospitals in violation of federal law. Defendants, in turn, submitted claims to Medicare, Medicaid, and other government healthcare programs and obtained millions of dollars worth of payments from the United States. Under the False Claims

3

Act, 31 U.S.C. § 3729(a)(1), such claims were false and/or fraudulent because defendants had no entitlement to payment for services provided on referrals from such physicians.

7.     Defendants also violated the False Claims Act, 31 U.S.C. § 3729(a)(2), by making or causing to be made false statements when submitting these claims for payment to Medicare and other government programs. Defendants falsely certified the claims and statements were "true" and/or "correct" and as such were entitled to payment.

8.     To conceal their unlawful conduct and avoid refunding payments made on the false claims, defendants also falsely certified, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(7), that the services identified in their annual cost reports were provided in compliance with federal law, including the prohibitions against kickbacks, illegal remuneration to physicians, and improper financial relationships with physicians. The false certifications, made with each annual cost report submitted to the government, were part of defendants' unlawful scheme to defraud Medicare and other government healthcare programs.

## II. JURISDICTION

9.     The Court has subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345 and supplemental jurisdiction to entertain the common law and equitable causes of action pursuant to 28 U.S.C. § 1367(a). The Court may exercise personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a) because all of the defendants reside in and transact business in the Northern District of Ohio.

4

### III. VENUE

10.     Venue is proper in the Northern District of Ohio, the transferor Court, under 31

U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because all of the defendants reside or transact

business in that District.

### IV. PARTIES

11.     Dr. Kirby brings this action on behalf of The United States and, more specifically,

on behalf of the Department of Health and Human Services (HHS) and the Health Care

Financing Administration (HCFA), on behalf of the Medicare and Medicaid programs.

12.     Relator Dr. Kirby, is an individual who resides in Cleveland Heights, Ohio. Dr.

Kirby was the former co-Chairman of the Cardio-Thoracic Surgery Department at University

Hospitals of Cleveland, Inc.

13.     Defendant University Hospitals Health System, Inc. (UHHS), is an Ohio not-for-

profit corporation that acts as the parent company for, or is a shareholder in, the defendants in

this suit. UHHS has its principal place of business at Cleveland, Ohio. UHHS operates other

medical facilities in the Northern District of Ohio.

14.     University Hospitals of Cleveland, Inc. (UHC), is an Ohio not-for-profit

corporation. UHC operates University Hospital in Cleveland, Ohio and has its principal place of

business at Cleveland, Ohio.

15.     UHHS/CSAHS – Cuyahoga, Inc., is an Ohio not-for-profit corporation doing

business in Cleveland, Ohio under the registered trade name St. Vincent Charity Hospital (St.

Vincent). Upon information and belief, UHHS/CSAHS – Cuyahoga, Inc., is owned by

5

defendants UHHS and The Sisters of Charity of St. Augustine Health System, Inc., and was formed to facilitate the joint ownership and operation of St. Vincent.

16.    The Sisters of Charity of St. Augustine Health System, Inc., (St. Augustine) is an Ohio not-for-profit corporation with its principal place of business in Cleveland, Ohio.  As stated above, St. Augustine operates St. Vincent in conjunction with defendant UHHS through defendant UHHS/CSAHS – Cuyahoga, Inc. St. Augustine operates other health care facilities in the Northern District of Ohio.

## V. THE LAW

### A.    The False Claims Act

17.    The False Claims Act (FCA) provides, in pertinent part that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; . . . or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.
>
> * * *
>
> is liable to the United States Government for a civil penalty of not less than  $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

31 U.S.C. § 3729.

6

**B.**     **The Anti-kickback Statute**

18.     The Anti-kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that payoffs to those who can influence healthcare decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of the program from these difficult to detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care.  First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

19.     The Anti-kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare, Medicaid and (as of January 1, 1997) TRICARE programs.  42 U.S.C. § 1320a-7b(b).

**C.**     **The Stark Statute**

20.     Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Statute") prohibits a hospital (or other entity providing healthcare items or services) from submitting Medicare claims for payment based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the hospital.  The regulations implementing 42 U.S.C. § 1395nn expressly require that any entity

7

collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

21.     The Stark Statute establishes the clear rule that the government will not pay for items or services prescribed by physicians who have improper financial relationships with other providers.  In enacting the statute, Congress found that improper financial relationships between physicians and entities to whom they refer patients can compromise the physicians' professional judgment as to whether an item or service is medically necessary, safe, effective, and of good quality.  Congress relied upon various academic studies consistently showing that physicians who had financial relationships with hospitals and other entities used more of those entities' services than similarly situated physicians who did not have such relationships.  The statute was designed specifically to reduce the loss suffered by the Medicare program due to such increased questionable utilization of services.

22.     Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II.  Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider.  *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

23.     In 1993, Congress extended the Stark Statute (Stark II) to referrals for ten additional designated health services.  *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

24.     As of January 1, 1995, Stark II applied to patient referrals by physicians with a prohibited financial relationship for the following ten additional "designated health services":

8

(1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment, and supplies; (8) prosthetics, orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services. See 42 U.S.C. § 1395nn(h)(6).

26. In pertinent part, the Stark Statute provides:

(a) Prohibition of certain referrals

(1) In general

Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then --

(A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third-party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn (emphasis added).

26. The Stark Statute broadly defines prohibited financial relationships to include any "compensation" paid directly or indirectly to a referring physician, subject to certain exceptions not applicable in this case.

27. In sum, the Stark Statute prohibits hospitals from billing Medicare for certain designated services referred by a physician with whom the hospital has a financial relationship of any type not falling within specific statutory exceptions. 42 U.S.C. § 1395nn. The statute

9

specifically prohibits hospitals from billing for such services.  In-patient and out-patient hospital services and home health services are among the designated health services to which the Stark II referral and billing prohibitions apply.

## VI.  THE FEDERAL HEALTHCARE PROGRAMS

### A.    The Medicare Program

28.    In 1965, Congress enacted Title XVIII of the Social Security Act. known as the Medicare Program, to pay for the costs of certain healthcare services.  Entitlement to Medicare is based on age. disability or affliction with end-stage renal disease.  *See*  42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. *See* 42 U.S.C.  §§ 1395c-1395i-4.  Most hospitals. including all of UHHS' hospitals, derive a substantial portion of their revenue from the Medicare Program.

29.    HHS is responsible for the administration and supervision of the Medicare Program.  HCFA is an agency of HHS and is directly responsible for the administration of the Medicare Program.

30.    Under the Medicare Program. HCFA makes payments retrospectively (after the services are rendered) to hospitals for inpatient services.  Medicare enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in the Medicare Program.  However. Medicare does not prospectively contract with hospitals to provide particular services for particular patients.  Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

31.     As detailed below, UHHS and its affiliated hospitals submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

32.     To assist in the administration of Medicare Part A, HCFA contracts with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and auditing cost reports.

33.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a HCFA Form UB-92 (and prior to 1992, on a HCFA Form UB-82).

34.     As a prerequisite to payment by Medicare, HCFA requires hospitals to submit annually a form HCFA-2552, more commonly known as the Hospital Cost Report. Cost Reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

35.     After the end of each hospital's fiscal year, the hospital files its Hospital Cost Report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.F.R. § 405.1801(b)(1). Hence, Medicare relies upon the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

11

36.     UHC and St. Vincent were, at all times relevant to this complaint, required to submit Hospital Cost Reports to their fiscal intermediaries.

37.     Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s/UB-82s) during the course of the fiscal year.  On the Hospital Cost Report, this Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider.  This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year.  From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare Program or the amount due the provider.

38.     Under the rules applicable at all times relevant to this complaint, Medicare, through its fiscal intermediaries, had the right to audit the Hospital Cost Reports and financial representations made by UHC and St. Vincent to ensure their accuracy and preserve the integrity of the Medicare Trust Funds.  This right includes the right to make retroactive adjustments to Hospital Cost Reports previously submitted by a provider if any overpayments have been made. 42 C.F.R. § 413.64(f).

39.     Every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

40.     For cost reporting periods prior to September 30, 1994, the responsible provider official was required to certify, in pertinent part:

> to the best of my knowledge and belief, it [the Hospital Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

Form HCFA-2552-81.

12

41.     Thus, the provider was required to certify that the filed Hospital Cost Report is

(1) truthful, i.e., that the cost information contained in the report is true and accurate, (2) correct,

i.e., that the provider is entitled to reimbursement for the reported costs in accordance with

applicable instructions, and (3) complete, i.e., that the Hospital Cost Report is based upon all

information known to the provider.

42.     The "applicable instructions" contained in the pre-September 1994 certification

included the requirement that services described in the cost report complied with Medicare

program requirements, including the provision outlawing kickbacks, codified in 42 U.S.C.

§ 1320a-7b(b).

43.     The pre-September 1994 Hospital Cost Report (HCFA-2552-81) reminded

providers that "intentional misrepresentation or falsification of any information contained in this

cost report may be punishable by fine and/or imprisonment under federal law."

44.     On September 30, 1994, Medicare revised the certification provision of the

Hospital Cost Report to add the following:

> I further certify that I am familiar with the laws and regulations
> regarding the provision of health care services, and that the
> services identified in this cost report were provided in compliance
> with such laws and regulations.

Form HCFA-2552-92.

45.     Subsequently, in or about 1996, the Hospital Cost Report was revised again to

include the following notice:

> Misrepresentation or falsification of any information contained in this cost
> report may be punishable by criminal, civil and administrative action, fine
> and/or imprisonment under federal law.  Furthermore, if services
> identified in this report were provided or procured through the payment

13

directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

46.     Under all versions of the HCFA Form 2552 certification, the provider certified that the services provided in the cost report were not infected by a kickback. Once the Stark Statute became effective, the provider certified that the services provided in the cost report were billed in compliance with the Stark Statute.

47.     UHHS, UHC, St. Vincent, and St. Augustine are familiar with the laws and regulations governing the Medicare Program, including requirements relating to the completion of cost reports.

48.     A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary. 42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports.

49.     Hospital Cost Reports submitted by UHC and St. Vincent were, at all times material to this complaint, upon knowledge and belief, signed by UHHS, UHC or St. Vincent employees or corporate officers, who attested, among other things, to the certification quoted above.

## 2.     The Medicaid Program

50.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

51.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding. which is called federal financial participation (FFP). 42 U.S.C. §§ 1396, *et seq.*

52.     Each state's Medicaid program must cover hospital services. 42 U.S.C. § 1396a(10)(A). 42 U.S.C. § 1396d(a)(1)-(2).

53.     In Ohio, provider hospitals participating in the Medicaid program file annual cost reports with the State's Medicaid agency, The Ohio Department of Jobs and Family Services, or its intermediary, in a protocol similar to that governing the submission of Medicare cost reports.

54.     Providers incorporate the same type of financial data in their Ohio Medicaid cost reports as contained in their Medicare cost reports, and include data concerning the number of Medicaid patient days at a given facility.

55.     Typically, a Medicaid cost report also requires an authorized agent of the provider to expressly certify that the information and data on the cost report is true and correct.

56.     Medicaid programs use the Medicaid patient data in the cost report to determine the reimbursement to which the facility is entitled.  The facility receives a proportion of its costs equal to the proportion of Medicaid patients in the facility.

57.     Where a provider submits the Medicare cost report with false or incorrect data or information to Medicaid. this necessarily causes the submission of false or incorrect data or information to the state Medicaid program, and the false certification on the Medicare cost report necessarily causes a false certification to Medicaid as well.

15

58.     Where a provider submits a Medicaid cost report containing the same false or incorrect information from the Medicare cost report, false statements and false claims for reimbursement are made to Medicaid.

59.     Upon knowledge and belief, UHC and St. Vincent hospitals named herein sought reimbursement from designated state Medicaid programs for the time period pertinent to this Complaint.

## VII. DEFENDANTS' SCHEME

### A.     UHHS's Unlawful Conduct

60.     During the time period relevant hereto, UHHS, UHC, St. Augustine, St. Vincent and UHHS/CSAHS – Cuyahoga, Inc., were aware of the prohibitions against kickbacks and the legal restrictions on financial relationships with physicians.  This awareness was based on information obtained by defendants from various sources, including its counsel, outside training programs, trade associations, and the government.  This information was known to UHHS officers, including, but not limited to the Chief Executive Officer of UHHS.  Despite this information, UHHS, UHC, St. Augustine, St. Vincent and UHHS/CSAHS – Cuyahoga, Inc., and possibly other hospitals and/or healthcare facilities owned or operated by the defendants embarked on a strategy of paying kickbacks to and engaging in unlawful financial relationships with physicians to induce patient referrals to UHHS facilities.  The defendants in turn billed for and collected millions of dollars in reimbursement from the United States based on patient referrals from these same physicians.

61.     In order to induce physicians to refer patients to UHHS hospitals and other UHHS facilities, defendants, with the full knowledge of the Chief Executive Officer of UHHS, provided

the following unlawful inducements and kickbacks to physicians who were in a position to refer patients to UHHS facilities and entered into the following prohibited relationships with such physicians:

      (a)    <u>Financing Physician Practice Expenses</u>. UHHS and/or UHC, St. Augustine, St. Vincent, and/or UHHS/CSAHS – Cuyahoga, Inc., enabled physicians to avoid expenses attendant to their own private practices by financing or paying for their employees (including other physicians), equipment or other expenses through several interrelated mechanisms. This included Practice Guarantee Agreements (PGA's). These PGA's guaranteed the incomes of physicians who owned their own separate medical practices. This guarantee was after all expenses and would include the payment of practice expenses if the particular practice did not generate sufficient income to cover expenses and salary to the physician.

      (b)    <u>Practice Plan Arrangements</u>. UHHS and/or UHC, St. Augustine, St. Vincent, and/or UHHS/CSAHS – Cuyahoga, Inc., employed what the defendants referred to as "Practice Plan Arrangements" (PPA's) where certain doctors, usually the clinical chairperson of a particular department would own outright the shares of a corporation organized for the practice of medicine. UHHS would supply a PGA for the shareholders of these PPA corporations and also would supply PGA's for other, shareholder or non-shareholder.

      (c)    <u>Uncollected Excess Payments Under PGA's</u>. UHHS advanced millions of dollars under the PGA's. While the PGA with the shareholders of Surgical Group required Surgical Group to repay the amounts advanced under the PGA's, there was a tacit agreement that that was not to be done. The vast majority of the amounts advanced were never collected fro Surgical Group. Upon knowledge and belief, this practice was followed with other PPA's.

17

(d)    <u>Improper Recruitment Packages</u>.  UHHS paid for the cost of recruiting new physicians into the existing PPA's of "loyal" physicians as a reward and inducement to the existing PPA physicians for referring patients to UHHS facilities.  These packages sometimes carried with them the promise of advances of at least $250,000, paid by UHHS or UHC in order induce the recruited physician to join the PPA.  The packages offered to recruited physicians required them to refer all patients to UHHS facilities.

(e)    <u>Phony Directorships</u>.  UHHS, in addition to providing compensation through PGA's to PPA shareholders and to PPA physician-employees, paid to each physician an amount as a "director fee" for being a "director" of a group at UHC.  The usual amount paid under this practice was $150,000 annually, in addition to any amount paid under the PGA.  For this remuneration, the physician was not required to perform substantial services.

**B.    <u>The Scheme Begins in Cleveland, Ohio at Least as Early as July 5, 1989, and Continues Through 2000</u>**

62.    UHHS's business strategy under in the late 1980's and 1990's was to grow market share in identifiable, profitable areas.  The easiest way to accomplish this task was by paying handsomely for high profile medical practices

63.    UHHS/UHC recruited Drs. Wulf Utian, James Goldfarb and Robert Kiwi who were the owners of Mt. Sinai OBGYN Specialties, Inc., to practice with UHHS.  In order to accomplish this. UHHS guaranteed that $2,000,000 per year would be made available to the physicians for use in their practice on an annual basis.  This association and payment was intended to cause Mt. Sinai OBGYN Specialties and Drs. Wulf, Golbfarb and Kiwi to refer all of their patients to UHHS controlled facilities.

18

64.     In January of 1998. UHHS, through UHC, executed a letter agreement with Dr. Thomas James Kirby and Dr. Robert Stewart.

65.     At the time of the January letter agreement between UHC and Drs. Kirby and Stewart. Kirby and Stewart, it was contemplated that they would incorporate their own corporation of which they were to be the sole shareholders.  This corporation, University Cardiac & Thoracic Surgical Group, Inc. (Surgical Group), an Ohio corporation. was incorporated shortly thereafter with Drs. Stewart and Kirby as the sole shareholders. Surgical Group was what the Defendants called a PPA and was the mechanism used to funnel money to the physicians who owned or were employed by Surgical Group in exchange for their referrals.

66.     The letter agreement between UHC and Drs. Kirby and Stewart included a PGA that guaranteed incomes to Drs. Kirby and Stewart, through Surgical Group of $650,000 and $750,000 annually as well as full benefits, office expenses, employees, etc.

67.     PGA's guaranteeing the incomes of other physicians to be hired by Surgical Group were also included as part of the letter agreement between UHC and Drs. Kirby and Stewart.

68.     While the letter agreement between UHC and Drs. Kirby and Stewart stated that receipts for the Surgical Group's clinical practice net of practice expenses would be remanded to UHC, there was a tacit agreement that no repayment of any deficit to UHC would be required.

69.     Upon information and belief, UHHS through UHC, St. Vincent, Rainbow Babies & Childrens' Hospital, or through other entities, employed the Practice Plan/PGA arrangement with other groups of physicians and similarly had tacit agreements that no repayment of monies advanced would be required, the purpose of which was to cause those physician groups to make referrals to UHHS facilities.

19

70.     Plaintiff, on behalf of the United States was damaged because of the acts of defendants in submitting, causing to be submitted, or conspiring to submit false claims, statements and records in that it paid UHC and St. Vincent for items and services for which they were not entitled to reimbursement.

71.     Defendants profited unlawfully from the payment of illegal remuneration and kickbacks to physicians.

## FIRST CAUSE OF ACTION

(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1))

72.     Plaintiff repeats and realleges ¶¶ 1 through 71 as if fully set forth herein.

73.     Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States, including claims for reimbursement for services rendered to patients unlawfully referred to UHHS facilities by physicians to whom defendants provided kickbacks and/or illegal remuneration and/or with whom defendants entered into prohibited financial relationships in violation of the Anti-kickback Statute and/or the Stark Statute.

74.     By virtue of the false or fraudulent claims made by the defendants, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

## SECOND CAUSE OF ACTION

(False Claims Act:  Making or Using False
Record or Statement to Cause Claim to be Paid)
(31 U.S.C. § 3729(a)(2))

75.     Plaintiff repeats and realleges  ¶¶ 1 through 71 as if fully set forth herein.

20

76.     Defendants knowingly made, used, or caused to be made or used, false records or statements – *i.e.*, the false certifications and representations made or caused to be made by defendants when initially submitting the false claims for interim payments and the false certifications made or caused to be made by defendants in submitting the cost reports – to get false or fraudulent claims paid or approved by the United States.

77.     By virtue of the false records or false statements made by the defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

### THIRD CAUSE OF ACTION

(False Claims Act: Making or Using False Record
or Statement to Avoid an Obligation to Refund)
(31 U.S.C. § 3729(a)(7))

78.     Plaintiff repeats and realleges ¶¶ 1 through 71 as if fully set forth herein.

79.     Defendants knowingly made, used or caused to be made or used false records or false statements – *i.e.*, the false certifications made or caused to be made by defendants in submitting the cost reports – to conceal, avoid or decrease an obligation to pay or transmit money or property to the United States.

80.     By virtue of the false records or false statements made by the defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

### FOURTH CAUSE OF ACTION

(False Claims Act: Conspiring to Submit False Claims)
(31 U.S.C. § 3729(a)(3))

81.     Plaintiff repeats and realleges ¶¶ 1 through 71 as though fully set forth herein.

82.      Defendants entered into agreements with certain physicians and conspired to defraud the United States by submitting false or fraudulent claims for reimbursement from the United States for monies to which they were not entitled, in violation of 31 U.S.C. § 3729(a)(3).  As part of schemes and agreements to obtain reimbursement from the United States in violation of federal laws, defendants conspired to provide kickbacks and illegal remuneration to physicians and to engage in prohibited financial relationships with physicians in violation of the Anti-kickback Statute and/or the Stark Statute, and to cause the United States to pay claims for health care services based on false claims and false statements that the services were provided in compliance with all laws regarding the provision of health care services whereas they were not so provided.

83.      By virtue of defendants' conspiracy to defraud the United States, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

## FIFTH CAUSE OF ACTION

(Payment by Mistake of Fact)

84.      Plaintiff repeats and realleges ¶¶ 1 through 71 as if fully set forth herein.

85.      This is a claim for the recovery of monies paid by the United States to the defendants as a result of mistaken understandings of fact.

86.      The false claims which defendants submitted to the United States' agents were paid by the United States based upon mistaken or erroneous understandings of material fact.

87.      The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of defendants' certifications and representations, paid defendants certain sums of

money to which they were not entitled, and defendants are thus liable to account and pay such amounts, which are to be determined at trial, to the United States.

### SIXTH CAUSE OF ACTION

(Unjust Enrichment)

88.     Plaintiff repeats and realleges ¶¶ 1 through 71 as if fully set forth herein.

89.     This is a claim for the recovery of monies by which all defendants have been unjustly enriched.

90.     By directly or indirectly obtaining Government funds to which they were not entitled, Defendants were unjustly enriched, and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

### SEVENTH CAUSE OF ACTION

(Disgorgement of Illegal Profits,
For Imposition of a Constructive Trust and an Accounting)

91.     Plaintiff repeats and realleges ¶¶ 1 through 71 as if fully set forth herein.

92.     This is a claim for disgorgement of profits earned by the Defendants because of illegal kickbacks these Defendants paid to physicians.

93.     Defendants concealed their illegal activity through false statements, claims and records, and failed to abide by their duty to disclose such information to the United States.

94.     The United States did not detect Defendants' illegal conduct.

95.     This Court has the equitable power to, among other things, order the Defendants to disgorge the entire profit the Defendants earned from business generated as a result of their violations of the Anti-kickback Statute, the Stark Statute, state laws and the False Claims Act.

23

96.     By this claim, Dr. Kirby, on behalf of the United States requests a full accounting of all revenues (and interest thereon) and costs incurred by the Defendants on referrals from physicians to whom they paid kickbacks, disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States on those profits.

## EIGHTH CAUSE OF ACTION

(Recoupment of Overpayments)

97.     Plaintiff repeats and realleges ¶¶ 1 through 71 as if fully set forth herein.

98.     This is a claim for recoupment, for the recovery of monies unlawfully paid by the United States to defendants contrary to statute or regulation.

99.     The United States paid defendants certain sums of money to which they were not entitled, and defendants are thus liable under the law of recoupment to account and return such amounts, which are to be determined at trial, to the United States.

## NINTH CAUSE OF ACTION

(Common Law Fraud)

100.     Plaintiff repeats and realleges ¶¶ 1 through 71 as if fully set forth herein.

101.     Defendants made material and false representations in their initial requests for interim payments and in their cost reports with knowledge of their falsity or reckless disregard for their truth, with the intention that the United States act upon the misrepresentations to its detriment.  The United States acted in justifiable reliance upon defendants' misrepresentations by making interim payments on the false claims and then by settling the cost reports at inflated amounts.

102.     Had the true facts been known to the United States, defendants would not have received the interim payments or the inflated amounts on the cost reports.

24

103.    By reason of these interim payments and the inflated amounts on the cost reports, the United States has been damaged in an as yet undetermined amount.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, on behalf of the United States, demands and prays that judgment be entered in its favor against defendants, jointly and severally, as follows:

1.    On the First, Second, Third and Fourth Causes of Action under the False Claims Act, as amended, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.    On the Fifth, Sixth and Eighth Causes of Action, for payment by mistake, unjust enrichment, and recoupment, for the damages sustained and/or amounts by which the defendants were unjustly enriched or by which defendants retained illegally obtained monies, plus interest, costs, and expenses, and all such further relief as may be just and proper.

3.    On the Seventh Cause of Action, for disgorgement of illegal profits, for an accounting of all revenues unlawfully obtained by defendants, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by defendants and such further equitable relief as may be just and proper.

4.    On the Ninth Cause of Action, for common law fraud, for compensatory and punitive damages in an amount to be determined, together with costs and interest, and for all such further relief as may be just and proper.

Respectfully submitted,

Robert J. Rotatori – 0003346
ROTATORI, BENDER, GRAGEL, STOPER
& ALEXANDER, CO., LPA
526 Superior Avenue, East
800 Leader Building
Cleveland, Ohio 44114
(216) 928-1010 x 206
rrotatori@rotatori.com

ATTORNEY FOR PLAINTIFF/RELATOR
DR. THOMAS JAMES KIRBY

## VERIFICATION

| | | |
|---|---|---|
| STATE OF OHIO | ) | |
| | ) | ss: |
| COUNTY OF CUYAHOGA | ) | |

Thomas James Kirby, being duly sworn, deposes and says:  I have read the annexed Verified Complaint and know the factual allegations and contents set forth with respect to the factual allegations regarding University Hospitals Health Systems, Inc., and its subsidiaries and affiliates, are true to the best my knowledge, except those matters therein which are stated to be alleged on information and belief, and as to those matters I believe them to be true.  My belief as to those matters not stated upon my knowledge is based upon my review of records in the files of University Cardiac and Thoracic Surgical Group, Inc., and all other court records respecting the issues in this suit.

THOMAS JAMES KIRBY

SWORN TO and subscribed in my presence this __23__ day of July, 2003.

Notary Public

JOSEPH P. ALEXANDER, Attorney At Law
Notary Public - State of Ohio
My commission has no expiration date,
Section 147.03 R. C.